O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| STEVE S.,            | Case No. 2:18-cv-00872-KES |
|----------------------|----------------------------|
| Plaintiff,           |                            |
| v.                   | MEMORANDUM OPINION AND ORDER |
| ANDREW SAUL,[1]      |                            |
| Defendant.           |                            |

# I.

# BACKGROUND

In July 2014, Steve S. ("Plaintiff") filed an application for disability insurance benefits ("DIB") and supplemental security income ("SSI") alleging a disability onset date of September 30, 2013, when he was 32 years old. Administrative Record ("AR") 146, 151. From 1999 to 2013, Plaintiff worked at a warehouse and loading dock. AR 199, 248, 461. He was diagnosed with congestive heart failure in 2008 and had implantable cardioverter-defibrillator surgery in 2011, but he continued working. AR 247, 430. He stopped working on

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

1

September 13, 2013, because his employer's business closed. AR 182; see also AR 249 (reporting "no symptoms" to doctors in March 2013); AR 434 (stating in April 2013 that his right shoulder pain started "a few years ago"). Later in 2013, he pursued a workers' compensation claim asserting that he suffered an industrial injury in September 2012. AR 425, 429, 464. He claimed that his warehouse work involved continuously reaching above shoulder level, and he had injured his right shoulder through repetitive use. AR 429, 431, 464.

On August 24, 2016, an Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who was represented by counsel, appeared and testified, as did a vocational expert ("VE"). AR 36-64. On December 14, 2016, the ALJ issued a decision denying Plaintiff's applications. AR 20-29. The ALJ found that Plaintiff suffered from the severe, medically determinable impairments of "right shoulder strain/sprain and impingement syndrome with labral tear and paralabral cyst, idiopathic cardiomyopathy with a history of congestive heart failure and status post implantation of a cardioverter defibrillator device, hypertension, hypercholesterolemia and obesity[.]" AR 22. Despite these impairments, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a limited range of sedentary work activity with restrictions against reaching above his shoulders, climbing, and working around unprotected heavy machinery or unprotected heights. AR 24.

Based on this RFC and the VE's testimony, the ALJ determined that Plaintiff could work as an addresser (Dictionary of Occupation Titles ["DOT"] 209.587-010), ticket checker (DOT 219.587-010), and lens inserter (DOT 713.687-026). AR 28. The ALJ concluded that Plaintiff was not disabled. AR 29.

## II.
## STANDARD OF REVIEW

A district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free from legal error

and are supported by substantial evidence based on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla, but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Comm'r of SSA, 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing[,]" the reviewing court "may not substitute its judgment" for that of the Commissioner. Id. at 720-21.

"A decision of the ALJ will not be reversed for errors that are harmless." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). Generally, an error is harmless if it either "occurred during a procedure or step the ALJ was not required to perform" or if it "was inconsequential to the ultimate nondisability determination." Stout v. Comm'r of SSA, 454 F.3d 1050, 1055 (9th Cir. 2006).

## III.
## ISSUES PRESENTED

Issue One: Whether the ALJ's determination of Plaintiff's RFC is supported by substantial evidence.

Issue Two: Whether the ALJ's finding that Plaintiff could perform a significant number of jobs on a sustained basis is supported by substantial evidence.

(Dkt. 38, Joint Stipulation ["JS"] at 3.)

# IV.

# DISCUSSION

A. **ISSUE ONE: The RFC Determination.**

1. **Using His Upper Extremities.**

Plaintiff asserts that the ALJ did not consider (1) a medical evaluation finding that he had diminished right hand grip strength and right shoulder weakness, and (2) chiropractic progress notes showing that his right upper extremity had a limited range of motion. (JS at 6, citing AR 313, 332-59.) According to Plaintiff, the ALJ should not merely have restricted him against using his arms above shoulder level, but should have found "a bilateral loss of the use of his upper extremities[.]" (Id.)

   a. Summary of Medical Evidence.

AR 313 is one page of a November 2014 medical evaluation by chiropractor, Dr. Roberts, Plaintiff's primary treating source for his workers' compensation claim. AR 307-316. According to Dr. Roberts, Plaintiff developed pain in his right shoulder in March and April of 2013. AR 308. A CT scan of his shoulder in September 2013 showed mild degenerative joint disease, a labral tear, and a cyst. AR 308, 310. Grip strength testing yielded scores of 62, 58, and 58 pounds for his right hand and 98, 96, and 98 for his left hand. AR 311. Dr. Roberts translated this to mean, "Grip loss of the right dominant hand was approximately 57% …." AR 313. Plaintiff also had a reduced range of right-shoulder motion which Dr. Roberts translated into "an 11% upper extremity impairment[.]" AR 312-13.

Dr. Roberts noted that despite his right shoulder injury, Plaintiff reported "no problems with self-care such as bathing or dressing." AR 309. "His physical activity for normal daily activities [was] okay." Id. Plaintiff reported trouble with "power grasping with the right hand" and lifting more than 10 pounds. Id.

The records at AR 332-59 are Dr. Roberts's notes from chiropractic appointments from April 2013 through August 2014. For many of those months,

Dr. Roberts used a form with space to write the "patient's statement" and circle the degree of pain reported on a scale of 1-10. AR 341-48. In April 2013, Plaintiff reported "[right] shoulder pain mild" and pain at level 6. AR 347. In May 2013, his pain increased to 7; in June 2013, it increased to 8; in August 2013, it increased to 9. AR 347. On September 11, 2013 (i.e., just a few days before he stopped working), he reported "a lot of shoulder pain" rated at level 8. AR 348. By December 2013, however, his pain decreased to level 6 or 7. AR 342-43. In January 2014, he rated his pain at level 5 or 6. AR 342. Plaintiff reported being able to "raise up arm past chest[,]" but he had trouble "getting his arm up past his shoulders[;]" he was practicing arm exercises. Id. In March 2014, he continued to report inability to reach over his shoulders. AR 340-41. The forms for April through November 2014 mostly record Plaintiff's subjective complaints. AR 320-39. In May 2014, he reported, "Trouble lifting arm, ROM not good, gets sharp sudden pain in shoulder. Still can't sleep on right side." AR 332. In July 2014, he reported, "Right shoulder feels alright until he lifts arm up." AR 324.

    b.  Summary of Administrative Proceedings.

The ALJ cited this medical evidence from Dr. Roberts. AR 26 (citing Exhibit 4F). The ALJ found Plaintiff's testimony inconsistent with his reports to Dr. Roberts that he no problems with self-care and that his physical abilities for normal, daily activities was "ok." Id. The ALJ discredited a 2015 medical assessment by Dr. Roberts as "overreaching" and inconsistent with the other medical evidence. AR 26-27. After discussing other medical evidence (including a 2015 examination by Dr. Danzig that found full motor strength in the muscles of Plaintiff's right shoulder, arm, wrist, and fingers [AR 473]), the ALJ precluded Plaintiff from climbing and overhead reaching with both arms but concluded that no additional limitations on his use of his upper extremities was supported by the record. Id.

5

c.      Analysis.

None of the cited records discuss any limitations on Plaintiff's use of his *left* arm.  See AR 473-74 (noting full motor strength and range of motion in left upper extremity).  The thrust of the chiropractic records is that Plaintiff reported trouble reaching overhead, but no significant trouble with normal daily activities that require some arm use.  This is consistent with Plaintiff's Function Report wherein he reported that without assistance, he could shower, prepare and eat simple meals, drive, dress, shave, iron, clean the house for 45 minutes, and grocery shop.  AR 191-94.  When asked to identify functional impairments caused by his condition, Plaintiff did not identify trouble using his hands.  AR 196.  Even if Plaintiff has somewhat diminished righthand grip strength due to his shoulder injury, Plaintiff has not presented any arguments as to how less-than-full righthand grip strength would prevent him from doing the jobs identified by the ALJ.  In sum, the medical records identified by Plaintiff do not demonstrate legal error in the ALJ's RFC determination.

    **2.    Reading.**

Plaintiff's brief asserts that he "cannot read."  (JS at 6.)  Plaintiff argues that the ALJ failed to consider this when determining what jobs Plaintiff could do.  (Id.)

            a.      Summary of Evidence.

In his Function Report, Plaintiff stated that cannot follow written instructions "well" because he is "unable to read well."  AR 196.  He also stated that he could not use a checkbook or money orders because he "can't spell and read very well."  AR 194.  The Function Report was completed by his sister, Leticia S.  AR 198, 211.

In a different disability report, Plaintiff stated that he could speak, read, understand, and write more than his name in English.  AR 180.

At the hearing, Plaintiff testified without a translator or any other form of

assistance.  He gave appropriate answers in complete sentences to the ALJ's questions.  See, e.g., AR 39-40.  When the ALJ asked him why he had not applied for less physically demanding work after losing his job at the warehouse, Plaintiff testified that he could only read "small words here and there."  AR 46.

Plaintiff completed the 11th grade.  AR 41, 463.  He never received a GED.  AR 41.  He could drive and used a phone to set medication reminders.  AR 193-94.

        b.        Summary of Administrative Rules and Proceedings.

The DOT rates language skills on a scale of 1 to 6, with 1 being the lowest.  Obeso v. Colvin, No. 15-cv-0051, 2015 WL 10692651 at *15, 2016 U.S. Dist. LEXIS 53096 at *48 (E.D. Cal. Apr. 20, 2016); DOT, Appendix C.  The DOT defines Level 1 language skills as follows:

    Reading:    Recognize meaning of 2,500 (two- or three-syllable) words.  Read at rate of 95-120 words per minute.  Compare similarities and differences between words and between series of numbers.

    Writing:    Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.

    Speaking:    Speak simple sentences, using normal word order, and present and past tenses.

DOT, Appendix C.  A person who does not know at least 2,500 words in English does not meet the requirements of Level 1 language skills.  Pinto v. Massanari, 249 F.3d 840, 843 n.1 (9th Cir. 2001).

The DOT defines Level 2 language skills as follows:

    Reading:    Passive vocabulary of 5,000-6,000 words.  Read at rate of 190-215 words per minute.  Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation.  Read instructions for assembling model cars and

|   |   |   |
|---|---|---|
| | | airplanes. |
| | Writing: | Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs. |
| | Speaking: | Speak clearly and distinctly with appropriate pauses and emphasis, correct punctuation, variations in word order, using present, perfect, and future tenses. |

DOT, Appendix C.

The VE characterized Plaintiff's past relevant work at the loading dock as that of a hostler. AR 58. Per the DOT, working as a hostler typically requires Level 2 language skills. DOT 909.663-010. Consistent with this, Plaintiff reported that his prior work did not require him to write reports or type. AR 200.

When testifying about available jobs, the ALJ asked the VE to assume a hypothetical worker with Plaintiff's same education level. AR 58. The VE testified that his testimony was consistent with the DOT. AR 62. Per the DOT, working as a lens inserter requires Level 1 language skills, working as an addresser requires Level 2 language skills, and working as a ticket checker requires Level 3 language skills. DOT 713.687-026; DOT 209.587-010; DOT 219-587-010. Plaintiff's lawyer did not ask about the language skills associated with any of the jobs identified by the VE. AR 60-62.

The ALJ found that Plaintiff had "limited education" but could communicate in English. AR 27.

      c.    Analysis.

The evidence does not support the assertion that Plaintiff cannot read. Rather, Plaintiff consistently testified that he cannot read very well. AR 46, 194, 196. Plaintiff presents no evidence that his language skills became worse after he lost his hostler job. Plaintiff has not demonstrated legal error in the ALJ's finding that he could do jobs requiring Level 1 or Level 2 language skills, since he spent

years working as a hostler, a job that typically requires Level 2 language skills. Any error in finding that Plaintiff could work as a ticket checker is harmless, because the number of positions available nationally as an addresser and lens inserter (43,200 + 10,500) is a significant number of jobs. AR 28.

**B.      ISSUE TWO: Vocational Testimony.**

Plaintiff first argues that the hypothetical question posed to the VE failed to include all his limitations, because it did not include additional restrictions on using his upper extremities. (JS at 13-14.) This argument depends on Issue One. Because the ALJ did not err in determining Plaintiff's RFC (as decided in Issue One), the hypothetical posed to the VE (which mirrored Plaintiff's RFC) was not incomplete. Compare, AR 24 and AR 58-59.

Plaintiff next argues that the ALJ should have found that he would be "off task 20% of the time during a typical work day or work week due to pain and fatigue[.]" (JS at 14.) This argument also fails to demonstrate legal error.

First, fulltime work does not require being on task all eight hours of the workday. In the social security disability benefits context, fulltime work contemplates taking a morning, lunch, and afternoon break. See Learnaham v. Astrue, No. 09-cv-01143, 2010 WL 3504936 at *5, 2010 U.S. Dist. LEXIS 93121 at *18-19 (E.D. Cal. Sep. 3, 2010).

Second, Plaintiff fails to cite any medical evidence supporting this argument. Plaintiff testified that he went to medical appointments "probably twice a month" but he could visit some doctors in the evening when he was working. AR 47. Even if he missed work 2 days each month for medical appointments, that would mean missing work about 10% of the time. In his Function Report, he indicated that he could walk about 2 blocks before resting, and his condition did not affect sitting.[2] AR 196. He also reported that he could spend 45 minutes to 1 hour

---

[2] Compare, in November 2015, Plaintiff reported that he walked 20 to 25

cleaning his room.  AR 193.  This is consistent with sedentary work, which involves sitting approximately 6 hours and standing or walking approximately 2 hours during the workday, again with normal breaks.

## V.
## CONCLUSION

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the Commissioner's decision.

DATED:  September 12, 2019

                                         /s/ Karen E. Scott
                                      KAREN E. SCOTT
                                      United States Magistrate Judge

---

minutes 4 days/week.  AR 463.